## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MAURICE SPORTING GOODS, INC., et al.,[1] | Case No. 17-_____ (___) |
| Debtors. | Joint Administration Requested |

## DECLARATION OF PATRICK J. O'MALLEY
## IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST-DAY MOTIONS

1.      Effective contemporaneously with the filing of these chapter 11 cases on the Petition Date, I am the chief restructuring officer of debtor Maurice Sporting Goods, Inc. and hold the same position with each of its affiliated debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors").  Additionally, in the weeks prior to the Petition Date I served as a consultant to the Debtors.  As a result of this work, I am generally familiar with the Debtors' day-to-day operations, business affairs, and books and records, as well as the Debtors' recent restructuring efforts, sale efforts and related strategies.

2.      I submit this declaration (the "Declaration") in support of the First Day Pleadings (defined below) and to provide information to parties in interest regarding the Debtors.  Except as otherwise indicated, all statements set forth in this Declaration are based upon:  (a) my personal knowledge; (b) information supplied to me by other members of the Debtors' management or the Debtors' professionals; (c) my review of relevant documents; and (d) my opinion based upon my experience and knowledge of the Debtors' operations and financial

---

[1]  The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: Maurice Sporting Goods, Inc. (3399); Danielson Outdoors Company, Inc. (0840); South Bend Sporting Goods, Inc. (6658); Triple Crown Holdings, Inc. (1847); and Matzuo America, Inc. (4950).  The mailing address for the Debtors' corporate headquarters is 1910 Techny Road, Northbrook, Illinois 60065.

conditions.  If called upon to testify, I could and would testify to the facts set forth in this

Declaration.

3.     On the date hereof (the "Petition Date"), each of the Debtors filed

voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the

"Bankruptcy Code"), as well as certain motions and other pleadings (the "First Day Pleadings")

with this Court.

4.     As described in further detail below, the Debtors have filed these

chapter 11 cases in order to maximize the value of their assets for the benefit of all their

stakeholders through the going-concern sale of their business.  Headquartered in Northbrook,

Illinois and with operations in various other locations, the Debtors manufacture, source,

distribute, and wholesale outdoor sporting goods products, some of which include: fishing

products; terminal tackle products; shooting sports accessories; and other athletic goods.  The

Debtors are one of the largest distributors of outdoor sporting goods in North America with five

warehouse locations in the United States and Canada, selling products to independent dealers,

mass merchants, store operators, and large sporting goods stores.  In addition to distributing its

products, the Debtors offer in-store services utilizing regional experts and the latest technology

to develop product assortments, marketing schemes, and planograms for its customers, as well as

offer data analyses of the profitability of such services to them.  As a part of its strategic

planning services, the Debtors also offer a specialized merchandizing service whereby the

Debtors work with national manufacturers and regional vendors, analyzing the regional market

and targeting specific consumers, in an effort to supply its customers with products that serve

micro-markets.

5.      Unfortunately, due to the challenges discussed herein, the Debtors have found themselves in default of their Prepetition Loan Facility (as defined below) and facing near-term liquidity issues.  In order to address these challenges, the Debtors and their professional advisors, after considering all available strategic options, have determined that the best course to maximize the value of the Debtors' estates is to sell their assets through these chapter 11 cases.

6.      I have reviewed each of the First Day Pleadings (including the exhibits and other attachments to such pleadings) and it is my belief that each is true and correct.  The relief sought in the First Day Pleadings is necessary to the Debtors' efforts to preserve and maximize the value of their assets for the benefit of the Debtors' estates and all of the Debtors' stakeholders.  The First Day Pleadings are intended to enable the Debtors to operate effectively and efficiently within these chapter 11 cases, as well as minimize adverse consequences that might otherwise result from the commencement of such cases.

7.      Part I of this Declaration provides an overview of the Debtors' businesses. Part II provides a description of the Debtors' capital structure.  Part III provides a discussion of the events that compelled the commencement of these chapter 11 cases.  Part IV addresses the Debtors' strategy to maximize the value of their assets.  Part V affirms and incorporates the facts that support the relief requested in the First Day Pleadings.

**Part I**

**Overview of Debtors' Business**

**A.  History of the Debtors**

8.      The Debtors' origins trace back to 1923 when Maurice Olshansky founded what later became Maurice Sporting Goods, Inc. in Chicago after immigrating to America, first selling musical instruments out of a pushcart.  As the company grew, it began selling recreational

products in a small Chicago storefront.  Today, the Debtors are one of the largest value-added

distributors of recreational outdoor sporting goods in the world, specializing in niche product

categories that include: (i) fishing; (ii) marine; (iii) sports licensed products and souvenirs; (iv)

outdoor gifts and décor; (v) hunting; and (vi) camping and outdoor recreation.  Collectively, the

Debtors service over 15,000 store fronts across the United States, Canada, South America, and

Europe, including several large retailers, such as Walmart, Walmart Canada, Canadian Tire

Corp., and Academy Sports + Outdoors.

9.      From the 1990s to date, the Debtors' operations have expanded throughout

the country and the world, solidifying its position as a prominent sporting goods distributor.

Much of this was organic growth, including the opening of offices and distribution centers in

Canada and China.  However, the Debtors also conducted a series of acquisitions: (i) in 1992, the

Debtors acquired Matzuo America, Inc., which provides innovative and cost effective fishing

products; (ii) in 2007, the Debtors acquired Danielson Outdoors Company, Inc., which

specializes in the sale of terminal tackle products; (iii) in 2011, the Debtors acquired Redl Sports

Distributors, an outdoor sporting goods company located in Canada (which, as discussed below,

was sold prior to the Petition Date); (iv) in 2014, Maurice Sporting Goods, Inc. acquired the

assets comprising its "First Source" business, which sources private-label marine accessories;

and (v) that same year, Maurice Sporting Goods, Inc. acquired the assets of its "Rivers Edge"

business, which sources novelty products for outdoors enthusiasts.

**B.  <u>Business Segments and Operations</u>**

10.     A copy of the Debtors' organizational chart is attached hereto as <u>Exhibit</u>

<u>A</u>.  The Debtors' corporate headquarters is based in Northbrook, Illinois, and the majority of the

Debtors' employees are located in the United States.  The Debtors operate in six[2] major

segments: (i) "MSG Core"; (ii) "Big Game International"; (iii) "First Source"; (iv) "Rivers

Edge"; (v) "Danielson Outdoors Company, Inc."; and (vi) "Matzuo America."  The Debtors'

single largest customer is Walmart, who it has served for 40 years, and the remainder of the

Debtors' customer base is diverse.

### 1.  MSG Core

11.     The MSG Core segment consists of direct import, distribution and

manufacturing operations.  Facilitating the MSG Core business are three distributions centers

located across the United States and Canada, in (i) Mississauga, Ontario (just outside Toronto);

(ii) Reno, Nevada; and (iii) McDonough, Georgia.[3]  Each of the Debtors' distribution facilities is

leased, not owned.[4]  The Debtors leverage their distribution network to provide services to their

customers in the form of extensive stock keeping units ("SKU") product portfolios, knowledge

of regional product demands, and advanced supply chain management, fulfillment and logistics

capabilities.  Through their distribution centers, the Debtors provide over 60,000 SKUs from

over 1,000 of the industry's leading brands to customers.  In 2016, the Debtors constructed the

McDonough distribution center, a state-of-the-art 300,000 square foot distribution center

---

[2] The Debtors historically report financial metrics in five segments: MSG Core, FirstSource, RiversEdge, Danielson and Matzuo.  The Debtors' "Big Game International" operations are reported across each of these five segments, rather than as stand-alone numbers, but are discussed separately in this Declaration to provide a better understanding of the Debtors' business.

[3] As noted below, the Debtors also have two other distribution centers (located in Auburn Washington, and St. Clair, Missouri) operated through their other business segments, for a total of five distribution centers.

[4] The Debtors' corporate headquarters at 1910 Techny Road in Northbrook, Illinois is leased to them by TCP-Techny, L.L.C., an entity operated by the shareholders of Debtor Maurice Sporting Goods, Inc., and the Debtors have been paying reduced rent on the facility.  The Debtors are also party to two other ancillary leases in Northbrook with entities operated by Maurice Sporting Goods, Inc.'s shareholders, but the Debtors have vacated one facility (1825 Shermer Road, leased from OK Real Estate, LLC) and are vacating another effective no later than November 17, 2017 (1919 Stanley Street, leased from OK Real Estate II, LLC).  The Debtors have not been paying rent on the 1825 Shermer Road facility following their vacating the facility, but have been paying the taxes required under the lease.

utilizing advanced technology.  The MSG Core business also has leased office locations in Miami, Florida; Englewood, Colorado; and Bentonville, Arkansas, in addition to the Debtors' corporate headquarters in Northbrook, Illinois.  Shortly before the Petition Date, the Debtors' MSG Core business vacated facilities in Pittsburgh, Pennsylvania and Vancouver, Canada.

### 2.  Big Game International

12.     "Big Game International" ("BGI") is not a distinct legal entity but, rather, the Debtors' international product development division, and its operations support multiple Debtors.  BGI manufactures, designs and imports the Debtors' exclusive line of branded products, which fall into specialty categories such as hunting, fishing, fitness and athletics, camping, marine, and licensing and gifts.  South Bend®, Shoreline, Matzuo America®, Mossy Oak Hunting Accessories®, and several other key private brands are driven by BGI.  BGI's personnel are expert in sourcing, producing, packaging, and marketing its products.  Through BGI, the Debtors' internal product development team works with Asian and domestic manufacturing facilities to ensure the Debtors offer continuous product innovation and quality.  Its Asian operations are supported through a full-service office in Kunshan, China.

### 3.  First Source

13.     "First Source" is a trade name utilized by Maurice Sporting Goods, Inc. (not a distinct legal entity) for sourcing private-label marine accessories based out of an office in Fort Myers, Florida.  Its core brands include Shoreline Marine, Propel Paddle Gear by Shoreline Marine, and various retailer-specific brands.  First Source also is an original equipment manufacturer ("OEM") importer of marine accessories, with virtually no inventory and a dedicated relationship base.  First Source imports from BGI, Maurice Sporting Goods, Inc., and other retailer customers, and its customers include merchandisers, retailers, and distributors.

01:22459657.7

### 4. Rivers Edge

14.    "Rivers Edge" is a brand and trade name utilized by Maurice Sporting Goods, Inc. (not a distinct legal entity) for sourcing gift, décor and novelty items for outdoor enthusiasts.  Based out of an office in St. Clair, Missouri, its products are procured from a wide variety of vendors and sold to blue-chip retailers and other specialty stores.  The Rivers Edge segment also operates a distribution facility located at its leased St. Clair, Missouri, headquarters.

### 5. Danielson

15.    Based out of in Auburn, Washington, the "Danielson" segment is operated out of Debtor Danielson Outdoors Company, Inc., which is fully owned by Debtor Maurice Sporting Goods, Inc.  Danielson is a regional fishing importer and operates through independent wholesale and retail networks.  For over 50 years, Danielson has been an industry leader in terminal tackle products.  Its customers include buy groups, distributors, and dealers.  The Danielson segment also operates a distribution facility located at its leased Auburn, Washington, headquarters.

### 6. Matzuo

16.    Based out of South Sioux, Nebraska, the "Matzuo" segment is operated out of Debtor Matzuo America, Inc., which is held by Maurice Sporting Goods, Inc. through an intermediary holding company, Debtor Triple Crown Holdings, Inc.  Matzuo provides innovative and cost effective fishing products, primarily delivered under private label for Cabela's and Arkie's.  Product categories include baits and lures, hooks, jigheads, rigs, bottom bouncers, swivels, and other accessories.

01:22459657.7

## C. **Debtors' Assets and Liabilities**

17.     For the twelve months ending September 30, 2017, the Debtors generated approximately $259,093,158.00 in net sales on a consolidated basis.  As of the Petition Date, the book value of the Debtors' assets and liabilities are both over $100 million (though, as discussed below, the marketing of the Debtors has indicated the realizable value of their assets to be considerably less).  The Debtors have no cash on hand as of the Petition Date other than cash made available to them on a revolving basis under the Prepetition Loan Facility (as defined and discussed below).

### Part II

### **Capital Structure of the Debtors**

18.     As of the Petition Date, the Debtors have in excess of $100 million in outstanding secured and unsecured debt obligations, including trade debt of approximately $50 million, but exclusive of outstanding intercompany debts.  As of the Petition Date, the Debtors' primary funded debt obligation consisted of a prepetition loan facility (the "Prepetition Loan Facility") with approximately $45 million outstanding as of the Petition Date, for which BMO Harris serves as agent (in such capacity, the "Agent") for the prepetition lenders party thereto ( as party thereto from time to time, the "Prepetition Lenders") and CIBC serves as joint administrative agent ("Joint Administrative Agent," and, together with the Agent, the "Agents").  The significant liabilities of the Debtors are described in more detail below.

## A. **Prepetition Loan Facility**

19.     On June 19, 2009, each of the Debtors entered into the Prepetition Loan Facility through that certain *Loan and Security Agreement* (as amended, restated, modified, supplemented, or replaced from time to time, the "Prepetition Loan Agreement"), by and among the Debtors, the Prepetition Lenders, and the Agents.  The Prepetition Loan Facility was used to

pay off the Debtors' then-existing revolving credit facility of up to $65 million with Bank of America, N.A., and also provided the Debtors with a revolving credit facility of the same $65 million maximum amount on such date (with a current maximum amount of $60 million, subject to the borrowing base discussed below).

20.     The Debtors secured their obligations under the Prepetition Loan Facility by granting the Agents, for the benefit of the Prepetition Lenders, a first-priority lien on substantially all of the Debtors' assets (collectively, the "Prepetition Collateral").  The borrowing availability under the Prepetition Loan Facility is capped by a borrowing base calculated by taking the sum of certain specified percentages of value of the Debtors' inventory and accounts receivables, subject to certain reserves and sub-limits.

21.     Through that certain *Thirteenth Amendment* dated as of December 15, 2016 by and among the Agents, Prepetition Lenders, Debtors and OK Real Estate, LLC ("OK Real Estate"), OK Real Estate was added as a guarantor under the Prepetition Loan Facility and agreed to certain rent abatements.  As noted above, OK Real Estate is managed by the shareholders of Debtor Maurice Sporting Goods, Inc. and is a landlord to the Debtors.  OK Real Estate's guaranty extends to all Obligations (as defined in the Prepetition Loan Agreement) of the Debtors under the Prepetition Loan Facility, and pledges a mortgage and security interest in the real property at 1825 Shermer Road in favor the Prepetition Lenders.

22.     As noted above, as of the Petition Date there is approximately $45,156,510.66 outstanding under the Prepetition Loan Facility.  This is inclusive of CAD $81,953.88 securing a single letter of credit in favor of Canadian Border Services Agency, which letter of credit the Debtors believe is no longer necessary following their sale of the Redl Sports Distributors business and which the Debtors are attempting to cancel and credit to the Agents.

Interest under the Prepetition Loan Facility accrues at a variable rate that is currently approximately 6% per annum.

**B.  Other Secured Claims**

23.     In addition to the Prepetition Loan Facility, the Debtors have granted discrete security interests in certain miscellaneous equipment in connection with equipment financings currently owing to General Electric Capital Corporation, Konica Minolta Business Solutions USA Inc., MB Financial Bank, N.A., River Capital Finance LLC, and Raymond Leasing Corporation.  As of the Petition Date, the Debtors believe approximately $2,317,855 is owed in connection with these equipment financings.[5]

**C.  Unsecured Obligations**

24.     In the ordinary course of operating their business, the Debtors purchase goods and services from hundreds, if not thousands, of trade creditors.  As of the Petition Date, the Debtors estimate that they owe approximately $50 million to third-party trade creditors. Other major unsecured debt includes certain unsecured acquisition debt.  With respect to the 2014 "Rivers Edge" acquisition, this includes $3.6 million for a final installment payment of the purchase price, $440,000 and 900,000 for two contractual bonus payouts owing to seller, approximately $349,000 that may be owing to seller for an unused reserve, and over $250,000 of accrued interest.  With respect to the 2014 "First Source" acquisition, this includes installment payments of $700,000 and $1.4 million, a bonus payout owing to seller of $400,000, and approximately $74,000 of accrued interest.  The Debtors are also obligated to the three owners of Debtor Maurice Sporting Goods, Inc., Andrew Katlin, Jory Katlin and Michael Olshansky, for

---

[5] BRS Canada Acquisition Inc., an affiliate of Big Rock Sports, LLC, has also filed a financing statement against the Debtors, to perfect the assignment of accounts receivable purchased from the Debtors when it bought the Redl Sports Distributors business from the Debtors, as discussed further herein.

approximately $830,000, $4.1 million, and $200,000, respectively, for repayment of loans

provided to the Debtors.  Additionally, the Debtors are obligated to each other for certain

intercompany obligations owing from one Debtor to another.

### Part III

### Events Leading to the Commencement of These Cases

25.     For decades, the Debtors' business has been a fundamentally strong one,

providing significant value to a diverse customer and vendor base.  Prior to 2016, the Debtors

successfully achieved over 90 years of consistent profitability.  More recently, however, the

Debtors have faced challenges that have combined to impair the Debtors' operating cash flow

and its liquidity.

26.     Among these is the Debtors' decision to strategically invest in eventually

combining its United States distribution centers into one, state-of-the-art facility, its facility

located in McDonough, Georgia.  Despite the Debtors' concentrated efforts to control costs, the

build-out of the facility ran significantly over budget.  Similarly, upon its opening in the fall of

2016, its operating costs greatly exceeded expectations while new distribution processes and

procedures were gradually implemented.

27.     The Debtors have also faced losses as a result of the recent bankruptcies of

several retailers, including The Sports Authority, MC Sports (also known as Michigan Sporting

Goods Distributors), Gander Mountain and Sport Chalet, and a generally challenging retail

environment.  This has been compounded by some foreign exchange impairment, including

recently as a result of the weak Canadian dollar.  Adding to all of these challenges is the

Debtors' leverage, including both its secured debt and an unsecured acquisition debt, such as the

approximately $5.5 million in remaining unsecured acquisition debt owed for installment and

other payments on the 2014 "Rivers Edge" acquisition, and approximately $2.5 million in remaining unsecured acquisition debt owed for the 2014 "First Source" acquisition.

28.     Over prior months, the Debtors engaged in a number of operational initiatives to improve operating efficiency and margins after retaining Portage Point Partners as financial advisor in March 2017 to assist with these operational efforts, which reduced annualized costs by approximately $16 million.  In furtherance of their efforts, the Debtors divested a non-core asset, its Vancouver-based Redl Sports Distributors business, through a sale of such non-core business to BRS Canada Acquisition Inc., an affiliate of Big Rock Sports, LLC. This sale was consummated on August 25, 2017 for $2,291,192 (subject to certain potential adjustments) and the assumption of certain liabilities under open purchase orders.  After initially identifying the Redl sale opportunity but prior to its consummation, the Debtors also retained Livingstone Partners to explore strategic alternatives, and subsequently thereto Livingstone oversaw nearly six months of extensive marketing efforts for sale and investment opportunities. Ultimately, however, all of these efforts were unable to return the Debtors' business to near-term profitability, precipitating the need for these chapter 11 cases.

## Part IV

### The Post-Petition Financing and Sale of the Debtors' Assets

29.     The Debtors, in consultation with their advisors, have diligently evaluated a range of strategic alternatives to address their liquidity challenges.  Over the last six months, Livingstone Partners, with the assistance of the Debtors' other advisors, solicited and explored a range of alternatives, from capital investments to a sale of substantially all of the Debtors' assets to a sale of certain of the Debtors' assets.  As a result of these efforts, the Debtors publicly announced the prospective acquisition of most of their business by a third-party buyer and

strategic competitor on October 9, 2017.  Less than 10 days later, however, the prospective buyer withdrew from the acquisition.

30.     As a result of this, Livingstone again marketed the Debtors, which ultimately resulted in a single draft letter of intent on November 5, 2017 (the "LOI") from Middleton Management Company, LLC ("Middleton").  Following subsequent negotiation of the LOI, it is the Debtors' intention to file a bid procedures and sale motion based on the LOI while finalizing an asset purchase agreement with Middleton, which would include provisions for the assumption and assignment of specified contracts, and to conduct a competitive sale process with Middleton as a stalking horse bidder.

## Part V

## Facts Relevant to the First Day Pleadings

31.     To facilitate these chapter 11 cases, the Debtors have filed the First Day Pleadings, requesting various forms of relief.  Generally, the First Day Pleadings have been designed to meet the Debtors' goals of:  (a) continuing their operations in chapter 11 with as little disruption and loss of productivity as possible while the Debtors seek to maximize the value of their estates through these chapter 11 cases; (b) maintaining the confidence and support of their employees and other key constituents during the chapter 11 process; and (c) establishing procedures for the smooth and efficient administration of these chapter 11 cases.

32.     I have reviewed each of the First Day Pleadings filed contemporaneously herewith, and the facts set forth in the First Day Pleadings are true and correct to the best of my knowledge, information and belief, and are incorporated herein by reference.  It is my belief that the relief sought in each of the First Day Pleadings is tailored to meet the goals described above and, ultimately, will enhance the Debtors' ability to maximize the value of their estates for the benefit of all of the Debtors' stakeholders.

01:22459657.7

33.     It is my further belief that, with respect to those First-Day Pleadings requesting the authority to pay discrete prepetition claims or continue selected prepetition programs, the relief requested is essential to preserve the value of the Debtors' estates and necessary to avoid immediate and irreparable harm to the Debtors and all stakeholders of the Debtors' estates.  The Debtors believe that payment of those selected prepetition claims identified in the First Day Pleadings will forestall such irreparable harm, thus maximizing the value of the Debtors' estates to the benefit of all stakeholders.

34.     The Debtors have an immediate need to continue the operation of their business by paying employees in the normal course of business pending the completion of their chapter 11 efforts, and making other necessary payments as set forth in the First Day Pleadings. Further, the Debtors believe that such relief will enable them to stabilize their operations and avoid a chaotic post-filing period.

## A.  Motion for Joint Administration

35.     Many of the motions, applications, hearings, and orders in these chapter 11 cases will jointly affect each Debtor.  Under these circumstances, the interest of the Debtors, their estates, their creditors, and other parties in interest would be best served by the joint administration of these chapter 11 cases for procedural purposes only.  The joint administration of these chapter 11 cases will ease the administrative burden on the Court and all parties in interest, and will protect creditors of the respective estates against potential conflicts of interest. For these reasons, the Debtors submit, and I believe, the relief requested in this motion is in the best interest of the Debtors, their estates and their creditors.

## B.  Motion to Appoint 156(c) Claims Agent

36.     The Debtors request entry of an order, pursuant to section 156(c) of title 28 of the United States Code, and Rule 2002-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), authorizing the retention and appointment of Epiq Bankruptcy Solutions, LLC ("Epiq"), as claims and noticing agent in these chapter 11 cases.  The Debtors selected Epiq after soliciting proposals from Epiq and three other potential claims and noticing agents, which I am advised exceeds the minimum number of proposals that must be considered by the rules of this Court.  I believe that the relief requested in Epiq's retention application will ease the administrative burden on the Clerk of the Court in connection with these chapter 11 cases.  In addition, I have been advised by counsel that Epiq's retention is required by the Local Rules in light of the Debtors' number of creditors.

**C.  Motion for Confirmation of the Automatic Stay and Debtors' Operating Status**

37.     The Debtors have operations in the United States, Canada, and China, and a significant number of overseas vendors and suppliers.  I am advised that many of the Debtors' overseas vendors and suppliers may not be aware of the provisions of the automatic stay in section 362 of the Bankruptcy Code or of the scope of a debtor in possession's authority to conduct business.  Nor are all such creditors likely cognizant of their significance and impact.  I am advised that debtors in bankruptcy often must advise third parties of the existence and effect of sections 362 of the Bankruptcy Code and the automatic stay they create, and occasionally a chapter 11 debtor has to initiate proceedings in the bankruptcy court to enforce the protections contained therein. Additionally, I am advised that creditors may inaccurately believe that the Debtors are no longer operating or that an administrator or liquidator has been appointed and the Debtors are no longer in control of their operations. Without the basics for understanding the

authority the Bankruptcy Code provides for continued operation of the business, the Debtors believe that some of their foreign creditors may be unwilling to continue to deal with the Debtors, to the detriment of their business and prospects for their chapter 11 cases.  To avoid such unnecessary actions, and to provide notice to parties unfamiliar with the Bankruptcy Code of the scope and effect of the automatic stay, I am advised a bankruptcy court may issue an order embodying and restating those provisions.

38.     Given the composition of the Debtors' creditor base and the potential adverse impact on the Debtors' operations from misunderstandings on the part of the Debtors' overseas vendors, I consider such a motion necessary in these chapter 11 cases.

**D.  Motion to Provide Utilities Adequate Assurance**

39.     The Debtors utilize various utility services provided by numerous utility companies (collectively, the "Utility Companies").  Because the Utility Companies provide essential services to the Debtors, any significant interruption in utility services would be highly problematic.  In fact, the temporary or permanent discontinuation of utility services at any of the Debtors' locations could irreparably disrupt business operations, and, as a result, fundamentally undermine the Debtors' efforts to maximize value.  Accordingly, the Debtors have proposed to protect the rights of the Utility Companies by providing such Utility Companies with a deposit in an amount equal to 50% of the Debtors' estimated monthly cost of the utility services following the Petition Date based on a trailing, 12-month average of utility invoices.  The Debtors submit that the deposit, in conjunction with the Debtors' ability to pay for future utility services in the ordinary course of business constitute adequate assurance of future payment to the Utility Companies to satisfy the requirements of section 366 of the Bankruptcy Code.  To the extent the

Utility Companies disagree, however, the Utility Companies would be able to utilize the Debtors' proposed procedures to seek additional adequate assurance.

40.    I believe the Debtors' proposed treatment of the Utility Companies is appropriate under the circumstances and should be approved.

### E.  Motion to Honor and Continue Insurance Programs

41.    In the ordinary course of their business, the Debtors maintain, among others, insurance programs for directors and officers, general liability, commercial coverage, property, ocean cargo, umbrella, crime, and foreign liability.  A listing of all known policies currently in effect, which list I have reviewed, is attached to the Debtors' motion.

42.    The Debtors' insurance policies are essential to preserve the value of the Debtors' business and assets, and are, in some cases, required by various laws, regulations or contracts that govern the Debtors' business (and I am advised that certain insurance policies are also required by the Guidelines established by the Office of the U.S. Trustee for chapter 11 bankruptcy cases).  It is critical that the insurance policies be maintained and renewed on an ongoing and uninterrupted basis.  Therefore, the Debtors request that the Court authorize them to pay all prepetition premiums, fees and expenses arising under, or related to, the insurance policies, and seek the related relief set forth in the Debtors' motion.

### F.  Motion to Honor and Continue Employee Obligations and Benefits

43.    The Debtors' employees constitute their most valuable asset and are essential to maximizing the value of the Debtors' estates.  If the Debtors' payroll is interrupted, or the Debtors cannot promptly pay prepetition employee obligations and continue to honor their employee benefits, many employees will suffer undue hardship and may seek employment elsewhere, at a time where their continued dedication to the Debtors is most crucial.  The

01:22459657.7

negative impact on employee morale, and the potential loss of employees at this critical juncture, would have a material adverse impact on the Debtors' ability to maximize value.

44.     To minimize the personal hardship that employees will suffer if prepetition employee-related obligations are not paid when due, and to maintain the employees' morale during this critical time, it is important that the Debtors be permitted to pay and/or perform, as applicable, their employee-related obligations as detailed in the Debtors' motion, including the following, whether arising pre- or post-petition:  (a) employee wages, salaries, commissions, and other compensation; (b) compensation of temporary and seasonal workers; (c) business expenses, including travel expenses and other reimbursable business expenses; (d) the Debtors' paid time off policies, severance obligations, and employee benefits programs and plans; (e) payroll deductions and withholdings with respect to employees; (f) workers' compensation programs; (g) third-party payroll and other administrators; (h) certain employee incentive programs; and (i) all costs and expenses incident to the foregoing (including payroll-related taxes and administrative and processing costs).

45.     I believe that the relief requested in the Debtors' motion will enable the Debtors to maximize the value of their estates for the benefit of all interested parties.

**G.  Motion to Honor Prepetition Taxes**

46.     The Debtors, in the ordinary course of their businesses, incur various tax liabilities (collectively, the "Taxes") and various other fees, permit costs and assessments (collectively, the "Fees," and together with the Taxes, collectively, the "Taxes and Fees") owed to certain taxing authorities (the "Authorities").

47.     Prior to the Petition Date, the Debtors generally paid their Taxes and Fees as they became due, and the Debtors believe any Taxes and Fees actually due and payable as of

the Petition Date are for current tax periods only and are less than $230,000.00 total.

Additionally, the Debtors have a number of Taxes and Fees that have accrued for periods prior to

the Petition Date, but not yet become due and payable.  Through the motion, the Debtors seek

entry of an order authorizing, but not directing, them to: (1) pay the Taxes and Fees to the

Authorities that were due and payable prior to the Petition Date, to the extent that the Debtors

believe, in their discretion, such Taxes and Fees are (a) trust fund taxes, (b) taxes that may give

rise to personal liability to officers or directors of the Debtors, (c) franchise taxes or related fees,

(d) regulatory fees, (e) import duties, (f) excise taxes, (g) sales and use taxes, (h) goods and

services taxes, (i) taxes that may give rise to a lien on any assets of the Debtors, or (j) similar

taxes; (2) pay any Taxes and Fees that become due and payable after the Petition Date in the

ordinary course of business, regardless of when accrued; and (3) pay any Taxes and Fees that are

subsequently determined upon audit for periods prior to the Petition Date.

48.     The Debtors have ample business justification to pay the Taxes and Fees,

subject to the limitations set forth in the motion, because it is my understanding that:

(a) payment of the Taxes and Fees would not prejudice general unsecured creditors in so far as

the Taxes and Fees would be priority claims under the Bankruptcy Code that likely would have

to be paid in full under any chapter 11 plan before any of the Debtors' general unsecured

obligations may be satisfied; (b) the funds to satisfy certain of the Taxes and Fees may not

constitute property of the Debtors' chapter 11 estates in certain instances; (c) failure to pay

certain of the Taxes and Fees could give rise to liens on certain of the Debtors' property; and

(d) the Debtors' directors and officers may face personal liability if certain of the Taxes and Fees

are not paid.  Therefore, to prevent immediate and irreparable harm that would result from such

disruptions and distractions, the Debtors seek authority to pay the Taxes and Fees.

**H.  Motion to Honor and Continue Customer Programs**

49.     The Debtors, in the ordinary course of their business, engage in certain sales practices that are designed to maximize their profitability.  These include promotional programs, rewards programs, rebates and discount pricing, and the other programs detailed in the Debtors' motion (collectively, the "Customer Programs").  These programs are designed to retain and attract customers, and to enhance loyalty and sales among the Debtors' customer base.

50.     The Debtors believe that the continuation of the Customer Programs is necessary in all instances to avoid the immediate and irreparable harm that would result from the failure to do so.  If the Debtors are not permitted to immediately honor the Customer Programs, customers would be frustrated by the Debtors' failure to honor their obligations under the Customer Programs, causing a loss of goodwill that would impair the value of the Debtors' brands.

**I.  Motion to Honor Claims of Shippers, Warehousemen and Other Lien Claimants**

51.     In connection with the day-to-day operation of their businesses, the Debtors necessarily depend on an extensive shipping, warehousing and distribution network to move product to their customers (the "Merchandise").  In connection therewith, the Debtors engage the use of common carriers, dedicated carriers, freight-forwarders, ocean carriers, parcel carriers, consolidators, brokers, and customers agents (collectively, the "Shippers") for moving their supplies and inventory to their warehouses for distribution to their customers or, in some instances, direct shipment to their customers.  The Debtors also support their distribution capabilities by contracting with certain third-party warehousemen, distributors and logistics providers (collectively, the "Warehousemen").

52.     If the Debtors fail to pay the Shippers or Warehousemen for charges incurred in connection with the transportation and storage of any Merchandise (the "Transporter Claims"), various statues, tariffs, and agreements may permit the Shippers or Warehousemen, as applicable, to assert possessory liens against Merchandise in their possession.  In addition, shipments may be stopped in transit if customs duties are not paid by the Debtors or their customs agents when due in the ordinary course.  Payment of the Transporter Claims is essential to the Debtors' efforts to maximize the value of their estates as it will avoid disruption in the Debtors' business, prevent the possibility of possessory liens being asserted against the Merchandise, and enable the Debtors to realize the value of the Merchandise and continue their business operations uninterrupted.

53.     Additionally, in the ordinary course of business, the Debtors employ the services of certain other parties (collectively, the "Lien Claimants") whose work may give rise to potential possessory or statutory lien claims under applicable non-bankruptcy law, as described more fully in the Debtors' motion (collectively, the "Lien Claims").  In addition to asserting liens against the Debtors' facilities (which would violate the terms of their leases, and cause landlord legal fees to accrue and potentially be asserted against the Debtors), goods, or equipment, certain Lien Claimants may refuse to perform their ongoing obligations to the Debtors, including manufacturing, installation, repair and servicing obligations, unless their Lien Claims are paid in full, causing harmful interruption to their business  Accordingly, payment of the Lien Claims is imperative to the Debtors' operations and ability to maximize the value of their estates for the benefit of their creditors.

54.     As a result of the foregoing, the Debtors seek authority to pay the undisputed amounts owed by the Debtors on account of outstanding Transporter Claims and Lien

Claims, not to exceed $1,866,000 and $50,000 in the aggregate, respectively, and to discharge the liens that parties holding Transporter Claims and Lien Claims may have on the Debtors' property.  Since statutory liens are generally senior liens under applicable state law, and because the Debtors believe the amounts owed to the holders of Transporter Claims and Lien Claims are less than the value of the property securing such claims in at least certain instances, such parties are likely fully secured creditors that must be paid in full under any chapter 11 plan before the Debtors' general unsecured creditors.  As such, payment of the Transporter Claims and Lien Claims will not prejudice general unsecured creditors.

**J.   Motion to Honor Claims of Critical Vendors and Foreign Vendors**

55.     The Debtors' business depends on, among other things, the Debtors' ability to retain their vendors and service providers and to maintain their reputation and customer loyalty within the outdoor sporting goods industry.  To efficiently operate their business, the Debtors have developed a purchasing, inventory, and delivery system that relies significantly on a large number of third parties who supply the Debtors with essential goods and services (the "Critical Vendors").  To identify the Critical Vendors, the Debtors reviewed their accounts payable and prepetition vendor lists to identify those creditors most essential to the Debtors' operations pursuant to the following criteria: (a) which suppliers were sole source or limited source suppliers, without whom the Debtors could not continue to operate without disruption or customer loss, (b) the Debtors' ability to find alternative sources of supply and the potential disruption or lost revenues while a new supplier was resourced, (c) whether a supplier is a customer-required supplier, (d) which suppliers would be prohibitively expensive to replace, (e) which suppliers would present an unacceptable risk to the Debtors' operations given the volume of essential services or products that such suppliers provide, (f) the extent to which suppliers may

have an administrative expense claim pursuant to section 503(b)(9) of the Bankruptcy Code, and

(g) whether a vendor meeting the foregoing criteria is able or likely to refuse to ship product to

the Debtors postpetition if its prepetition balances are not paid, considering, for example,

whether the particular vendor is under a contractual obligation to perform.

56.     If the Critical Vendors are not paid, their resulting unwillingness to

continue to provide products or services would cause an interruption of the Debtors' operations.

Such an interruption would cause the Debtors irreparable harm, which would impair the value of

the Debtors' estates and jeopardize the Debtors' chapter 11 efforts.  Relatedly, paying the

Critical Vendors would permit the Debtors to maintain the value of the businesses, thus

maximizing value for the benefit of their creditors and stakeholders.  Accordingly, the Debtors

seek authorization to pay the claims of Critical Vendors (the "Critical Vendor Claims"), subject

to the conditions set forth in the Debtors' motion, to ensure the Debtors' continued receipt of

goods and services and favorable credit terms from the Critical Vendors.

57.     In the ordinary course of business, the Debtors incur various obligations to

foreign vendors, suppliers and other entities (the "Foreign Vendors").   The Debtors rely on the

Foreign Vendors, which are primarily located in China, to supply various goods and services that

are crucial to the Debtors' ongoing operations.  Many of the Foreign Vendors who supply these

essential goods and services may argue that they are not subject to the jurisdiction of this Court

or the provisions of the Bankruptcy Code that would otherwise protect the Debtors' assets and

business operations, and take actions that would disrupt the Debtors' business operations.  There

is also a risk that Foreign Vendors could sue the Debtors in foreign courts and attempt to recover

prepetition amounts owed to them (the "Foreign Vendor Claims") if the Foreign Vendor Claims

remain unpaid.  If the Foreign Vendors were successful in obtaining judgments against the

Debtors, the Foreign Vendors could seek to exercise post-judgment remedies, including seeking to attach the Debtors' foreign assets or withholding vital supplies from the Debtors.

58.     Despite the Debtors' efforts to minimize these issues by obtaining an order confirming the automatic stay as discussed above, this will likely prove insufficient by itself to ensure that no disruptions to the Debtors' operations are caused by the Foreign Vendors. Accordingly, to avoid the resulting irreparable harm that would immediately arise from such issues, the Debtors must have the ability to continue to compensate the Foreign Vendors on an uninterrupted basis.

**K.   Motion to Continue Using Existing Cash Management System**

59.     In the ordinary course of business, the Debtors operate a cash management system (the "Cash Management System") involving ten domestic and four foreign bank accounts (collectively, the "Bank Accounts").  The Cash Management System provides a well-established mechanism for the collection, management and disbursement of funds used in the Debtors' business.

60.     In light of the substantial size and complexity of the Debtors' operations, significant disruptions to the Debtors' business would be highly likely if the cash management procedures must be quickly altered.  As such, it is essential that the Debtors be permitted to maintain their Cash Management System in its current format.

61.     Given the Debtors' corporate and financial structure and the number of affiliated entities participating in the Cash Management System, it would be difficult and unduly burdensome for the Debtors to establish an entirely new system of bank accounts and a new cash management and disbursement system for each of the Debtors.  The Debtors, therefore, seek authority for the continued use of the Cash Management System and Bank Accounts.  The

Debtors further seek authority to implement ordinary course changes to their Cash Management System and to open and close bank accounts, as set forth in the motion. The Debtors also request authority for the banks to charge and the Debtors to pay or honor service and other fees, costs, charges, and expenses to which the banks may be entitled under the terms of and in accordance with their contractual arrangements with the Debtors, and that such items be given superpriority administrative expense status.

62. The Debtors believe that the use of the domestic Bank Accounts, and their two Canadian Bank Accounts, complies with section 345(b) of the Bankruptcy Code. In addition, the Debtors utilize two Chinese Bank Accounts to hold limited amounts of cash in one of China's largest and oldest banks, the Bank of China, to support their Chinese office. The Debtors seek a waiver of section 345(b) of the Bankruptcy Code to permit them to continue to utilize these two Chinese Bank Accounts.

63. Additionally, the Debtors engage in inter-Debtor and intercompany transactions with each other in the ordinary course of business, as more fully described in the motion. These transactions include the sale of goods or provision of services from one Debtor entity to another. Others of these transactions involved the transfer of funds from one Debtor to another through intercompany borrowings and advancements made under the Debtors' Prepetition Loan Facility. The continuation of such ordinary course transactions will permit the Debtors to conduct business as usual and avoid any disruption to the detriment of the Debtors. The Debtors request that, pursuant to section 364(c)(1) of the Bankruptcy Code, the Court accord superpriority administrative expense status to all intercompany claims against a Debtor by another Debtor arising after the Petition Date as a result of intercompany transactions, and permit

the setoff of any postpetition intercompany transactions against other postpetition intercompany transactions in the Debtors' discretion.

64.     Finally, the Debtors seek authorization for other ancillary relief, all of which is necessary to maintain the Debtors' Cash Management System without interruption.

## L.  **Motion to Approve Post-Petition Financing and Cash Collateral Usage**

65.     The Debtors intend to finance their post-petition operations pending the sale through the use of cash collateral in which the Prepetition Lenders assert a security interest, and through the use of additional Post-Petition Financing from the Prepetition Lenders.

66.     The Debtors have an immediate need for use of cash collateral and the Post-Petition Financing to support their working capital requirements, make payments to vendors, employees and other third parties, and to pay other administrative expenses.  Such financing is critical to preserve the going concern value of the Debtors' estates, and to achieve the consummation of the proposed sale transaction.

67.     Because substantially all of the Debtors' assets, including their cash, are encumbered by the liens of the Prepetition Lenders, the Debtors have no unencumbered funds with which to pay ongoing wages, salaries and other operating expenses, including, but not limited to, rent and utility obligations, pending the proposed sale transaction.  Due to the nature of the Debtors' operations, which are dependent upon uninterrupted access to necessary working capital, immediate access to cash collateral and the Post-Petition Financing is essential to prevent irreparable harm to the Debtors' estates.  The Post-Petition Financing and use of the Prepetition Lenders' cash collateral is necessary to provide assurance to employees, landlords, suppliers and other parties that they will be paid on a timely basis for post-petition services, and to assure customers that they will have uninterrupted access to the Debtors' products.  Without immediate

access to cash collateral and the Post-Petition Financing, the Debtors' day-to-day operations would come to a halt, jeopardizing the Debtors' prospects of consummating the proposed sale transaction.

68.     The Debtors submit that there are no viable financing alternatives available to them other than the Post-Petition Financing and usage of cash collateral.  In that regard, prior to the Petition Date the Debtors explored other financing options by contacting four other lenders.  However, these efforts were unsuccessful as none of the other potential lenders contacted by the Debtors offered to provide Post-Petition Financing on any terms, much less terms superior to the proposed Post-Petition Financing.

69.     In the days prior to the Petition Date, the Debtors and the Prepetition Lenders exchanged several iterations of proposed orders and supporting budgets and continued to negotiate and finalize such documents up until the Petition Date.  Thus, the terms and conditions of the proposed Post-Petition Financing and cash collateral order were the product of extensive good faith, arm's length negotiations among the Debtors, the Prepetition Lenders and their respective professional advisors.

70.     Accordingly, and based on my discussions with the Debtors' professional advisors, I believe that the Post-Petition Financing and use of the Prepetition Lenders' cash collateral is the best (and indeed only) financing option available to the Debtors under the circumstances. I further believe that it provides the Debtors with access to liquidity that is required to maintain the going concern value of these estates while the Debtors pursue an expeditious sale transaction.

71.     In connection therewith, the Debtors propose to provide adequate protection to the Prepetition Lenders in the manner specified in the Interim Order.  As more fully

described in the DIP Motion and the Interim Order, such adequate protection measures include the granting of replacement liens and superpriorty claims (junior only to the to the liens securing the Post-Petition Financing, and the Carve-Out). Like the Post-Petition Financing generally, such adequate protection measures were negotiated in good faith and at arm's length among the Debtors and the Prepetition Lenders. I am advised that the Prepetition Lenders support and consent to the use of cash collateral and the form of adequate protection to be provided to them as specified in the DIP Motion and the Interim Order, but believe that their interests are adequately protected regardless.

72.     Overall, I believe that the relief requested in the DIP Motion is in the best interests of the Debtors' estates and is necessary to avoid immediate and irreparable harm, and the DIP Motion should be approved.

## **CONCLUSION**

73.     For all the reasons described herein and in the First Day Pleadings, which are incorporated herein by reference, I respectfully request that the Court grant the relief requested in each of the First Day Pleadings.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: November 20, 2017

Patrick J. O'Malley

**<u>EXHIBIT A</u>**

# Organization Chart



Notes:
1.  All entities are corporations organized under Delaware law.
2.  All entities are 100% owned by the applicable parent entity shown on this chart (provided that Maurice Sporting Goods, Inc. has multiple non-debtor shareholders).