## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| MAURICE SPORTING GOODS, INC., et al.,[1] | Case No. 17-12481 (CSS) |
| Debtors. | Jointly Administered |

**Obj. Deadline for Sale Procedures:**
   November 30, 2017 at 4:00 p.m. (ET) (requested)
**Sale Procedures Hearing Date:**
   December 5, 2017 at 2:00 p.m. (ET) (requested)
**Cure Amount Objection Deadline:**
   December 15, 2017 at 4:00 p.m. (ET) (requested)
**Sale Objection Deadline:**
   December 15, 2017 at 4:00 p.m. (ET) (requested)
**Sale Hearing Date:**
   December 20, 2017 at 10:00 a.m. (ET) (requested)

## MOTION OF THE DEBTORS
## FOR ORDERS: (A) (I) APPROVING SALE PROCEDURES;
## (II) APPROVING STALKING HORSE BIDDING PROTECTIONS;
## (III) SCHEDULING A HEARING TO CONSIDER SALE OF DEBTORS' ASSETS;
## (IV) APPROVING FORM AND MANNER OF NOTICE THEREOF;
## AND (V) GRANTING RELATED RELIEF; AND (B) (I) AUTHORIZING THE
## SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES,
## AND OTHER INTERESTS; (II) AUTHORIZING AND APPROVING
## PURCHASE AGREEMENT THERETO; (III) APPROVING THE ASSUMPTION
## AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED
## LEASES RELATED THERETO; AND (IV) GRANTING RELATED RELIEF

Maurice Sporting Goods, Inc. and its above-captioned affiliated debtors and debtors in possession (collectively, the "Debtors") hereby submit this motion (the "Motion"), pursuant to sections 105(a), 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), and Rules 2002, 6003, 6004, 6006, 9006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for entry of (a) an order, substantially in the form

---

[1]  The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: Maurice Sporting Goods, Inc. (3399); Danielson Outdoors Company, Inc. (0840); South Bend Sporting Goods, Inc. (6658); Triple Crown Holdings, Inc. (1847); and Matzuo America, Inc. (4950).  The mailing address for the Debtors' corporate headquarters is 1910 Techny Road, Northbrook, Illinois 60065.

annexed hereto as Exhibit A (the "Sale Procedures Order"), (i) approving sale procedures (the "Sale Procedures"), substantially in the form annexed as Exhibit 1 to this Sale Procedures Order, with respect to an auction (the "Auction") and sale (a "Sale") of the Assets (as defined below); (ii) approving stalking horse bidding protections for Middleton Management Company, LLC or its designee (the "Stalking Horse Bidder" or "Middleton"), (iii) scheduling a hearing (the "Sale Hearing") on the Sale and setting objection and bidding deadlines with respect to the Sale; (iv) directing that notice of the Sale Procedures and the Sale be given, substantially in the form annexed as Exhibit 2 to the Sale Procedures Order (the "Auction and Sale Notice"); and (v) granting related relief; and (b) an order or orders, substantially in the form annexed to the Motion as Exhibit B (the "Sale Order"), (i) authorizing the Sale of the Assets free and clear of liens, claims encumbrances, and other interests in accordance with the terms of that certain purchase agreement (the "Stalking Horse Purchase Agreement") to be entered into by and between the Debtors and the Stalking Horse Bidder pursuant to a letter of intent dated November 20, 2017 (the "LOI");[2] (ii) authorizing and approving the Stalking Horse Purchase Agreement; (iii) approving the assumption and assignment of executory contracts and unexpired leases, as necessary in connection with the Sale; (iv) providing for the payment of the net proceeds from the Sale of the Assets to BMO Harris Bank N.A. in its capacity as administrative agent (in such capacity, the "Agent") to the lenders (in such capacities, and collectively with the Agent, the "Lenders") under the Debtors' senior secured pre-petition secured credit facility (the "Pre-Petition Loan Facility") and secured post-petition financing facility (the "Post-Petition Loan Facility"), up to the amount outstanding under the Pre-Petition Loan Facility and Post-Petition Loan Facility, in accordance with the *Motion of the Debtors for Interim and Final Orders (I) Authorizing Secured*

---

[2] A copy of the LOI is attached hereto as Exhibit III. A copy of the Stalking Horse Purchase Agreement will be made available before the hearing on the Sale Procedures. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the LOI.

*Post-Petition  Financing Pursuant to 11 U.S.C. § 364, (II) Authorizing Use of Cash Collateral*

*Pursuant to 11 U.S.C. § 363, (III) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361,*

*363 and 364, and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(c)* (the "<u>DIP</u>

<u>Motion</u>") and any interim and final orders approving the DIP Motion (the "<u>Interim DIP Order</u>" and

"<u>Final DIP Order</u>," respectively, and collectively, the "<u>DIP Orders</u>"); and (v) granting related

relief.  In support of this Motion, the Debtors respectfully represent as follows:

## JURISDICTION AND VENUE

1.       The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334

and the *Amended Standing Order of Reference* from the United States District Court for the

District of Delaware, dated as of February 29, 2012 (the "<u>Amended Standing Order</u>").  This is a

core proceeding pursuant to 28 U.S.C. § 157(b)(2), and pursuant to Rule 9013-1(f) of the Local

Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District

of Delaware (the "<u>Local Rules</u>"), the Debtors consent to the entry of a final order by the Court in

connection with this Motion to the extent it is later determined that the Court, absent consent of the

parties, cannot enter final orders or judgments in connection herewith consistent with Article III of

the United States Constitution.

2.       Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.       The statutory predicates for the relief requested herein are sections 105(a), 363 and

365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9006 and 9014.

## GENERAL BACKGROUND

4.       On November 20, 2017 (the "<u>Petition Date</u>"), the Debtors filed voluntary petitions

for relief under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue

managing their properties and operating their business as debtors in possession pursuant to sections

1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or committee has been appointed in these chapter 11 cases.

5.      Additional information about the Debtors' business and the events leading to the commencement of these chapter 11 cases can be found in the *Declaration of Patrick J. O'Malley in Support of Debtors' Chapter 11 Petitions and First-Day Motions* [Docket No.2], which is incorporated herein by reference.

## SPECIFIC BACKGROUND

6.      Headquartered in Northbrook, Illinois and with operations in various other locations, the Debtors manufacture, source, distribute, and wholesale outdoor sporting goods products, some of which include: fishing products; terminal tackle products; shooting sports accessories; and other athletic goods.  The Debtors are one of the largest distributors of outdoor sporting goods in North America with five warehouse locations in the United States and Canada, selling products to independent dealers, mass merchants, store operators, and large sporting goods stores.  In addition to distributing its products, the Debtors offer in-store services utilizing regional experts and the latest technology to develop product assortments, marketing schemes, and planograms for its customers, as well as offer data analyses of the profitability of such services to them.  As a part of its strategic planning services, the Debtors also offer a specialized merchandizing service whereby the Debtors work with national manufacturers and regional vendors, analyzing the regional market and targeting specific consumers, in an effort to supply its customers with products that serve micro-markets.

7.      Unfortunately, the Debtors have found themselves in default of their Pre-Petition Loan Facility, and facing near-term liquidity issues.  In order to address these challenges, the Debtors and their professional advisors, after considering all available strategic options, have

determined that the best course to maximize the value of the Debtors' estates is to sell their assets through these chapter 11 cases.

8.      Over the last six months, Livingstone Partners, with the assistance of the Debtors' other advisors, solicited and explored a range of alternatives, from capital investments to a sale of substantially all of the Debtors' assets to a sale of certain of the Debtors' assets.  As a result of these efforts, the Debtors publicly announced the prospective acquisition of most of their business by a third-party buyer and strategic competitor on October 9, 2017.  Less than 10 days later, however, the prospective buyer withdrew from the acquisition.

9.      As a result of this, Livingstone continued to market the Debtors' assets, which ultimately resulted in a single draft letter of intent on November 5, 2017 (the "Draft LOI") from Middleton.  After engaging in negotiations regarding the terms of the Draft LOI, the Debtors and Middleton entered into the LOI on November 20, 2017, the terms of which will be incorporated into the Stalking Horse Purchase Agreement, contemplating a Sale of the Assets pursuant to section 363 of the Bankruptcy Code, subject to higher and better offers received after the commencement of these chapter 11 cases.

10.      To fund this process, the Debtors have reached agreement with the Lenders for the provision of the Post-Petition Financing Facility and the use of their cash collateral, as set forth in the DIP Motion.  As set forth in the proposed Interim DIP Order, the Lenders have conditioned the Post-Petition Financing Facility and the use of their cash collateral on, among other things, approval of a Sale Procedures Order, in form and substance satisfactory to the Lenders, by no later than December 5, 2017.  See Interim DIP Order, ¶ 21.

11.      Additionally, paragraphs 5 and 8 of the LOI require, and the Stalking Horse Purchase Agreement will require, the Debtors to meet the following milestones related to the Sale

of Assets to avoid termination of the LOI and, once executed, the Stalking Horse Purchase

Agreement:

<ol type="a">
<li>The Sale Procedures Order must be entered by this Court on or before December 1, 2017 (extended to December 5 during the "first day" hearing in these cases without objection from Middleton's counsel);</li>

<li>The Sale Procedures Order must provide that the Bid Deadline occurs by December 13, 2017;</li>

<li>The Sale Procedures Order must provide that the Auction shall be held by December 18, 2017;</li>

<li>The Sale Procedures Order must provide that the Sale Hearing shall be held by December 20, 2017;</li>

<li>The Sale to Middleton must close on or before December 22, 2017.</li>
</ol>

## RELIEF REQUESTED

12.     By this Motion, the Debtors seek first, (a) the entry of the Sale Procedures Order (i) approving the Sale Procedures; (ii) approving stalking horse bidding protections for the Stalking Horse Bidder, (iii) scheduling the Sale Hearing and establishing related deadlines; (iv) approving the form and manner of notice of the Sale Procedures, the Auction and Sale Hearing; and (v) granting such other and further relief as is just and proper; and second, (b) the entry of a Sale Order (i) authorizing the Sale of the Assets free and clear of liens, claims, encumbrances, and interests, pursuant to the Stalking Horse Purchase Agreement; (ii) authorizing and approving the Stalking Horse Purchase Agreement; (iii) approving the assumption and assignment of various executory contracts and unexpired leases related thereto; (iv) providing for the payment of net proceeds from the Sale of the Assets to the Agent, up to the amount outstanding under the Pre-Petition Loan Facility and Post-Petition Loan Facility, as set forth in the DIP Motion and DIP Orders, but except as otherwise required to be applied by the Stalking Horse Purchase Agreement; and (v) granting related relief.

A.      Sale Procedures and Assets to Be Sold

13.     The Debtors are proposing to sell the Assets pursuant to the terms of the Stalking

Horse Purchase Agreement, or such higher and better offer as the Debtors may later receive.  As a

result, the Debtors propose the Sale Procedures, which are incorporated herein by reference, in an

attempt to maximize the realizable value of the Assets for the benefit of the Debtors' estates,

creditors and other interested parties.  The Sale Procedures contemplate an Auction process

pursuant to which bids will be subject to higher or better offers.  As described more fully in the

Sale Procedures, only Qualified Bidders who timely submit Qualified Bids may be eligible to

participate in the Auction.  Specifically, the Sale Procedures provide, in relevant part, as follows:[3]

(a)     Participation Requirements.  In order to participate in the bidding process or otherwise be considered for any purpose hereunder, a person interested in the acquisition of the Assets other than the Stalking Horse Bidder, the Agent and the Lenders (a "Potential Bidder") must deliver to the Debtors and their counsel an executed confidentiality agreement in form and substance satisfactory to the Debtors.  In order for a Potential Bidder to become a Qualified Bidder, they must submit a Qualified Bid by the Bid Deadline, as set forth in the Bid Procedures.

(b)     Bid Deadline.  December 13, 2017 at 4:00 p.m. (prevailing Eastern Time).

(c)     Qualified Bid.  A bid (other than the Stalking Horse Purchase Agreement) must be a written irrevocable offer from a Qualified Bidder and (i) state that the Qualified Bidder offers to consummate the Sale pursuant to an agreement that has been marked to show any amendments and modifications to the Stalking Horse Purchase Agreement, including price and terms, that are being proposed by the Qualified Bidder (the "Marked Purchase Agreement"); (ii) confirm that such Qualified Bidder's offer shall remain open and irrevocable until the closing of the Sale of the Assets to the Successful Bidder or the Next Highest Bidder; (iii) confirm that such Qualified Bidder shall serve as the Next Highest Bidder, if so selected by the Debtors, and shall close the Sale of the Assets three (3) business days following written notification from the Debtor of the intent to accept the Next Highest Bid; (iv) enclose a copy of the proposed Marked Purchase Agreement; (v) the Marked Purchase Agreement must specifically identify the Assets proposed to be purchased, which must be all or substantially all of the Assets (including, but not limited to,

---

[3]  The following description of the Sale Procedures is a summary of the terms set forth in the Sale Procedures annexed hereto.  Capitalized terms used but not defined in this paragraph have the meanings ascribed to them in such Exhibit.  To the extent that this summary differs in any way from the terms set forth in such Exhibit, the terms of such Exhibit shall control.

contracts, leases, and agreements); (vi) contain a list of the Debtors' executory contracts and unexpired leases that the Qualified Bidder desires to assume and a packet of information, including financial information, that will be provided to the non-Debtor parties to such executory contracts and unexpired leases sufficient to demonstrate adequate assurance of future performance; (vii) except in the case of a credit bid, be accompanied by a wire transfer of a minimum good faith deposit (the "Minimum Deposit") in an amount of at least $500,000, which Minimum Deposit shall be used to fund a portion of the applicable purchase price and shall be increased if the Qualified Bidder is selected as a Successful Bidder or the Next Highest Bidder; (viii) provide that the Sale of the Assets shall close on or before December 22, 2017, unless otherwise agreed to and extended by the Debtors; (ix) not be conditioned on obtaining financing or the outcome of any due diligence by the Qualified Bidder; (x) most current audited and latest unaudited financial statements (collectively, the "Financials"), or, if the Qualified Bidder is an entity formed for the purpose of the Sale, the Financials of the financial sponsor of the Qualified Bidder or such other form of financial disclosure as is acceptable to the Debtors and the written commitment acceptable to the Debtors of the financial sponsor of the Qualified Bidder to be responsible for the Qualified Bidder's obligations in connection with the Sale (the Debtors also may condition Qualified Bidder status on such other information sufficient to demonstrate to the satisfaction of the Debtors that such Qualified Bidder has the financial wherewithal to consummate the Sale and provide adequate assurance of future performance under all agreements to be assumed as part of the Sale); (xi) not request or entitle the Qualified Bidder to any breakup fee, expense reimbursement or similar type of payment (except with respect to the Stalking Horse Bidder); (xii) fully disclose the identity of each entity (including financial sponsor(s)) that will be bidding for the Assets or otherwise participating in connection with such bid, and the complete terms of any such participation; (xiii) be on terms substantially similar or better to the Stalking Horse Purchase Agreement; and (xiv) include an overbid amount over the Purchase Price (as defined in the Stalking Horse Purchase Agreement) equal to $1,500,000 (the "Initial Overbid Amount Requirement").  On or before one (1) business day after the Bid Deadline, the Debtors shall make copies of all Qualified Bids available to the Qualified Bidders that submitted Qualified Bids.

(d)    Auction.  If one or more Qualified Bids other than the Stalking Horse Purchase Agreement are received prior to the Bid Deadline, an auction (the "Auction") will take place on **December 18, 2017 at 10:00 a.m. (prevailing Eastern Time)** (the "Auction Date") at the offices of Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, or such later time and place as the Debtors may provide so long as such change is communicated reasonably in advance by the Debtors to all Qualified Bidders that submitted Qualified Bids, counsel to any statutory committee appointed in the chapter 11 cases (the "Committee"), counsel to the Agent, and other invitees.  Debtors' counsel will arrange for the Auction to be transcribed or videotaped.  If only the Stalking Horse Purchase Agreement has been received by the Bid Deadline, the Auction will be deemed cancelled and the Stalking Horse Purchase Agreement will be deemed the Successful Bid, and the Debtors will seek authority from the Bankruptcy Court

to consummate the Sale as contemplated by the Stalking Horse Purchase Agreement.

(e)     <u>Auction Rules</u>.  If an Auction is held, the following rules for its conduct (the "<u>Auction Rules</u>") shall be observed: (i) only Qualified Bidders who have submitted Qualified Bids by the Bid Deadline will be eligible to participate at the Auction; <u>provided</u>, <u>however</u>, that any party in interest may attend (but not participate in) the Auction if they provide the Debtors written notice of their intention to attend the Auction on or before the Bid Deadline via electronic mail, c/o Debbie Laskin, at dlaskin@ycst.com; (ii) at the Auction, Qualified Bidders will be permitted to increase their bids.  The bidding at the Auction shall start at the highest and best Initial Bid meeting the Initial Overbid Amount Requirement, and then continue in increments of $100,000; and (iii) each Qualified Bidder will be permitted a fair, but limited, amount of time (no more than thirty minutes, unless otherwise allowed by the Debtors) to respond to the previous bid at the Auction.  The Debtors may, at any time during the Auction, call for one final round of sealed bids.  Bidding at the Auction will continue until such time as the highest or otherwise best offer for the Assets is determined in accordance with these Sale Procedures; (v) immediately prior to concluding the Auction, the Debtors (in their sole discretion, but in or after consultation with counsel to the Committee (if any) and the Agent shall (a) review each Qualified Bid on the basis of its financial and contractual terms and the factors relevant to the Sale process and the best interests of the Debtors' estates; (b) determine and identify the highest or otherwise best Qualified Bid for the Assets (the "<u>Successful Bid</u>") and the Qualified Bidder submitting such bid (the "<u>Successful Bidder</u>"); (c) determine and identify the next highest or otherwise best Qualified Bid for the Assets (the "<u>Next Highest Bid</u>") and the Qualified Bidder submitting such bid (the "<u>Next Highest Bidder</u>"); and (d) have the right to reject any and all bids, except for the Stalking Horse Purchase Agreement; (vi) within one business day of the completion of the Auction, the Successful Bidder and the applicable Debtors shall complete and execute all agreements, instruments, or other documents necessary to consummate the Sale contemplated by the Successful Bid.

(f)     <u>Sale Hearing</u>.  A hearing to consider approval of the Sale to the Successful Bidder will take place on **December 20, 2017 at 10:00 a.m.** before the Honorable Christopher S. Sontchi, in the United States Bankruptcy Court for the District of Delaware, 824 N. Market Street, Wilmington, Delaware 19801 (the "<u>Sale Hearing</u>").

(g)     <u>Acceptance of the Successful Bid and Next Highest Bid</u>.  If an Auction is held, then except with respect to the Stalking Horse Purchase Agreement, the Debtors shall be deemed to have accepted a Qualified Bid only when (i) such bid is declared the Successful Bid at the Auction and (ii) definitive documentation has been executed in respect thereof.  Such acceptance is conditioned upon approval by the Bankruptcy Court and the entry of an order approving such Successful Bid.  If (i) an Auction is held, (ii) the Successful Bidder and the Next Highest Bidder are selected, (iii) the Bankruptcy Court approves the Sale to the Successful Bidder, and (iv) the Sale to such Successful Bidder is not consummated because of a breach or failure to

perform on the part of such Successful Bidder, then the Debtors shall be authorized to consummate the Sale to the Next Highest Bidder without further court order or notice to any other party (other than counsel to the Committee and the Agent).  The Debtors specifically reserve the right to seek all appropriate damages from or relief against a defaulting Successful Bidder or Next Highest Bidder.

(h)     Return of Deposit.  Except in the case of a credit bid and except with respect to the Successful Bid and the Next Highest Bid, the Minimum Deposits tendered under these Sale Procedures shall be returned upon or within one (1) business day after the entry of an order approving the Sale to which such Minimum Deposits relates.  The Minimum Deposit of the Successful Bidder shall be held until the closing of the Sale and applied to the purchase price.  The Minimum Deposit of the Next Highest Bidder shall be returned upon or within three (3) business days after closing of the Sale to the Successful Bidder.  If the Successful Bidder fails to close the Sale, the Minimum Deposit shall be a non-exclusive remedy of the Debtors and the Debtors shall be entitled to any other rights or remedies available at law or in equity.

(i)     Reservation of Rights.  Other than in express contravention of any procedures required by or the terms of the Stalking Horse Purchase Agreement, the Debtors reserve the right as they may reasonably determine to be in the best interests of their estates, in consultation with counsel to the Committee (if any) and the Agent, to: (i) determine which bidders are Qualified Bidders (except with respect to the Stalking Horse Bidder); (ii) determine which bids are Qualified Bids (except with respect to the Stalking Horse Purchase Agreement); (iii) determine which Qualified Bid is the highest or otherwise best proposal and which is the next highest or otherwise best proposal, (iv) reject any bid that is (a) inadequate or insufficient (other than the Stalking Horse Purchase Agreement), (b) not in conformity with the requirements of these Sale Procedures, any applicable order of the Bankruptcy Court, or the requirements of the Bankruptcy Code, or (c) contrary to the best interests of the Debtors and their estates (other than the Stalking Horse Purchase Agreement); (v) waive terms and conditions set forth herein with respect to all potential bidders, (vi) impose additional terms and conditions with respect to all potential bidders (other than with respect to the Stalking Horse Purchase Agreement), (vii) subject to the consent of the Stalking Horse Bidder, extend the deadlines set forth herein, (viii) adjourn or cancel the Auction and/or the Sale Hearing in open court without further notice; and (ix) subject to the consent of the Stalking Horse Bidder, modify these Sale Procedures (other than in express contravention of any procedures required by the Stalking Horse Purchase Agreement) as they may determine to be in the best interests of their estates or to withdraw the Motion at any time with or without prejudice.

14.     The Debtors have made available for sale substantially all of their Assets.  The

Debtors intend to sell substantially all of their Assets to Middleton for a Purchase Price (as defined

in the LOI and, upon execution, the Stalking Horse Purchase Agreement) of up to approximately

$39 million, subject to higher and better offers received by the Debtors through the Sale Procedures and any related Auction. The Purchase Price consists of: (a) $3 million for the Closing Assets; (b) approximately $5 million for New Inventory, when and as purchased by the Stalking Horse Bidder following the Closing, for a purchase price equal to 90% of Seller's Cost; (c) approximately $21 million for Current Inventory, when and as purchased by the Stalking Horse Bidder following the Closing, and (d) approximately $10 million for Non-Current Inventory, when and as purchased by the Stalking Horse Bidder following the Closing.

15.    As required by Local Rule 6004-1(b), the Debtors submit that the proposed Sale does or may contemplate the following:

(a)    Agreements with Management. As a condition to closing, the LOI provides, and the Stalking Horse Purchase Agreement will provide, for the execution of a services agreement with (a) Patrick Wrob, the former owner and current manager of Rivers Edge, in such form and substance as the Stalking Horse Bidder deems necessary, in its sole discretion, and (b) Steve Arnold, former owner of First Source, whereby Middleton shall pay Mr. Arnold the sum of $750,000 per year for 3 years, commencing on June 30, 2018, for a total of $2.25 million. LOI ¶¶ 8(g)-(h). In addition, it is anticipated that the Stalking Horse Purchase Agreement will provide that the companies of each, Signet and Verko, will receive certain payments from the Debtors from Sale Proceeds. LOI ¶5(e).

(b)    Closing and Other Deadlines. The LOI provides, and, upon execution, the Stalking Horse Purchase Agreement will provide, Middleton the right to terminate the LOI and Stalking Horse Purchase Agreement if: (i) the Sale Procedures Order is not entered by December 5, 2017 (as modified on the record of the "first day" hearing); (ii) the Sale Procedures Order does not provide that the Bid Deadline shall occur by December 13, 2017; (iii) the Sale Procedures Order does not provide that the Auction shall be held by December 18, 2017; (iv) the Sale Procedures Order does not provide that the Sale Hearing shall be held by December 20, 2017; and (v) the Sale does not close by December 22, 2017. LOI ¶¶ 5(b) & 8.

(c)    Good Faith Deposit. Within three business days from the entry of the Interim DIP Order and the execution of an escrow agreement between the Stalking Horse Bidder and the Lenders, in form and substance acceptable to the Stalking Horse Bidder in its sole discretion, the Stalking Horse Bidder shall deposit the sum of $500,000 into an escrow account to be established at CIBC Bank USA. The deposit shall be immediately and fully refundable to

the Stalking Horse Bidder in the event for any reason whatsoever, the Stalking Horse Bidder terminates its interest in the Assets in writing, in its sole discretion, whether as a result of the Stalking Horse Bidder's due diligence review, inability to negotiate an acceptable Stalking Horse Purchase Agreement, or for any other reason of any kind or nature whatsoever. If and when the Stalking Horse Purchase Agreement consistent with the terms of the LOI is executed, the Deposit shall serve as an earnest money deposit thereunder pursuant to the terms and conditions of the Stalking Horse Purchase Agreement and Sale Procedures Order. LOI ¶¶ 5(d) & 7. It is anticipated that the Stalking Horse Purchase Agreement will provide for the forfeiture of the earnest money deposit to the extent the Stalking Horse Bidder terminates its interest in the Assets except as otherwise provided in the Stalking Horse Purchase Agreement.

(d)     Use of Proceeds. The Sale Order will provide that the Debtors will use the Sale proceeds to repay all obligations outstanding at the Closing under the Pre-Petition Loan Facility and Post-Petition Loan Facility in accordance with the DIP Orders.

The Sale Order will provide that any and all valid and perfected pre-petition or post-petition interests in or claims against the Assets of the Debtors purchased pursuant thereto shall attach to any proceeds of such Assets immediately upon receipt of such proceeds by the Debtors (or any party acting on any Debtors' behalf) in the order of priority, and with the same validity, force, and effect which they now have against such Assets.

(e)     Sale of Avoidance Actions. The Stalking Horse Purchase Agreement will provide a listing of causes of action to be acquired; it is anticipated this will include certain avoidance actions.

(f)     Requested Findings as to Successor Liability. The Sale Order will include a finding that Middleton is a not a successor to the Debtors or their estates by reason of any theory of law or equity with respect to any liens against the Debtors or the Assets.

(g)     Relief from Bankruptcy Rule 6004(h). A waiver of the stay imposed by Bankruptcy Rule 6004(h) is requested herein and contemplated by the Sale Order.

The ultimate purchase agreement and Sale Order negotiated with the Successful Bidder may contain additional provisions of the type set forth in Local Rule 6004-1.

B.     Stalking Horse Bidding Protections

16.     Prior to the Petition Date, the Debtors entered into advanced negotiations with Middleton regarding a potential stalking horse bid for the Assets.  These negotiations eventually resulted in the execution of the LOI, which forms the basis for the Stalking Horse Purchase Agreement that will be executed by Middleton.  Because the Stalking Horse Purchase Agreement will be subject to higher and better offers at the Auction, Middleton requires the approval of certain bid protections as a condition of its entry into the Staking Horse Purchase Agreement.

17.     The bid protections are as follows:[4]

(a)     The Debtors will pay Middleton a breakup fee of $500,000 (i.e., approximately 1.3% of the Purchase Price set forth in the LOI and, upon execution, the Stalking Horse Purchase Agreement) (the "Breakup Fee"), in the event Middleton is outbid and an alternative transaction closes;

(b)     Any competing bid to be considered higher and better than the Stalking Horse Purchase Agreement must provide an overbid equal to at least $1,500,000 (which is inclusive of the excessing bidding required for the Breakup Fee).  Each additional bid thereafter must be at least $100,000 in excess of the prior bid.

18.     These bid protections are incorporated into the Sale Procedures for the Assets annexed hereto.

C.     Notice of Auction and Sale Hearing

19.     The Debtors request that the Sale Hearing be scheduled for December 20, 2017 at 10:00 a.m. (ET).  On or before one business day after entry of the Sale Procedures Order, the Debtors will serve the Auction and Sale Notice by first-class mail, postage prepaid, Attn: Legal Department, Officer, Managing or General Agent, or to the attention of any other agent authorized

---

[4]  In addition to the provisions below, the Debtors included a provision in the Interim DIP Order entitling the Stalking Horse Bidder to an expense reimbursement fee of $150,000 in the event that: (a) the Stalking Horse Bidder provides the Deposit (as defined in the LOI) in accordance with the terms of the LOI, (b) the Stalking Horse Bidder executes the Stalking Horse Purchase Agreement consistent with the terms of the LOI on or before the hearing on the Sale Procedures, and (c) the Debtors are unable to obtain entry of the Sale Procedures Order with Bid Protections consistent with the terms of the LOI.

by appointment or by law to receive service of process, to all known holders of claims and equity

interests in the Debtors and all parties in interest listed on the Debtors' creditor matrix.

20.     In order to provide maximum notice to parties who may have an ownership or other

interest in the Assets and parties who may have a desire to participate in the acquisition of the

Assets, the Debtors propose the following additional notice be given.  On or before one business

day after the entry of the Sale Procedures Order, the Debtors will serve copies of the Auction and

Sale Notice, the Stalking Horse Purchase Agreement, and the Sale Procedures Order by first class

mail, postage prepaid, Attn: Legal Department, Officer, Managing or General Agent, or to the

attention of any other agent authorized by appointment or by law to receive service of process, to:

(i) the Office of the United States Trustee; (ii) counsel for the Agent; (iii) counsel for the

Committee; (iv) all entities known to have expressed a bona fide interest in acquiring the Assets to

the Debtors' investment banker; (v) all entities (or counsel therefor) known to have asserted any

lien, claim, encumbrance, right of refusal, or other interest in or upon any of the Assets;

(vi) federal, state, and local regulatory or taxing authorities that, as a result of the Sale of any of the

Assets, may have claims, contingent or otherwise, in connection with the Debtors' ownership of

any of the Assets or have any reasonably known interest in the relief requested by the Motion; (vii)

all parties, if any, who are known to claim interests in any of the Executory Contracts and Leases

(as defined below); (vii) all of the Debtors' insurance carriers; (x) the United States Attorney's

office; (ix) the Internal Revenue Service; and (x) all parties who have requested notice pursuant to

Bankruptcy Rule 2002 as of the date of service.

D.     Assumption and Assignment of Executory Contracts

21.     In connection with the Sale, the Debtors will seek to assume, assign, and/or transfer

to the ultimate purchasers of the Assets certain executory contracts and unexpired leases (the

"Executory Contracts and Leases").  In connection with the proposed assumption, assignment, and

or transfer of the Executory Contracts and Leases, the Debtors will prepare a schedule of all the Executory Contracts and Leases as well as the amounts that the Debtors believe are necessary to cure any defaults under such agreements pursuant to section 365 of the Bankruptcy Code (each a "Cure Amount").  Within one business days of the entry of the Sale Procedures Order, the Debtors will serve on each of the counterparties to the Executory Contracts and Leases a notice identifying the Executory Contracts and Leases to be assigned and the proposed Cure Amount for each.  The Debtors propose that if any counterparties to an Executory Contract or Lease wishes to object (each, an "Objection") to a proposed Cure Amount such Objection must: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Bankruptcy Rules; (c) be filed with the clerk of the Bankruptcy Court for the District of Delaware, Third Floor, 824 Market Street, Wilmington, Delaware 19801, on or before **4:00 p.m. (prevailing Eastern Time) on December 15, 2017**, or such later date and time as the Debtors may agree (the "Cure Amount Objection Deadline") and (d) be served by first class mail, overnight mail or courier so as to be received no later than 4:00 p.m. (prevailing Eastern Time) on the same day, upon (i) Maurice Sporting Goods, Inc., 1910 Techny Road, Northbrook, Illinois 60065 (Attn: Patrick J. O'Malley); (ii) counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801 (Attn.: Robert S. Brady, Esq. and Michael R. Nestor, Esq.); (iii) counsel to the Stalking Horse Bidder, Adelman & Gettleman Ltd., 53 W. Jackson Blvd., Suite 1050, Chicago, IL 60604 (Attn: Chad H. Gettleman); (iv) counsel to the Agent, Vedder Price, 222 North LaSalle Street, Chicago, Illinois 60601 (Attn: Douglas J. Lipke) and Pepper Hamilton LLP, 1313 Market Street, P.O. Box 1709, Wilmington, Delaware 19899 (Attn: David B. Stratton); (v) counsel to the Committee, if any; and (vi) the Office of the United States Trustee for the District of Delaware,

855 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801 (Attn: Mark Kenney) (collectively, the "Objection Notice Parties").

22.     The Debtors propose that if any counterparty to an Executory Contract or Lease wishes to object (each an "Objection") to the potential assignment of the applicable Executory Contract and Lease such Objection must: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Bankruptcy Rules; (c) be filed with the clerk of the Bankruptcy Court for the District of Delaware, Third Floor, 824 Market Street, Wilmington, Delaware 19801, on or before **4:00 p.m. (prevailing Eastern Time) on December 15, 2017**, or such later date and time as the Debtors may agree (the "Contract Objection Deadline") and (d) be served by first class mail, overnight mail or courier so as to be received no later than 4:00 p.m. (prevailing Eastern Time) on the same day, upon the Objection Notice Parties.  All Objections must include objections to assumption and assignment on all grounds, including the ability of the Stalking Horse Bidder to provide adequate assurance of future performance; provided, however, that Objections that relate solely to ability of any specific party, other than the Stalking Horse Bidder, to provide adequate assurance of future performance are preserved until the Non-Stalking Horse Assignee Objection Deadline (as defined below).

23.     If an Executory Contract and Lease is included in the Successful Bid or Next Highest Bid submitted by a party other than the Stalking Horse Bidder, the Debtors shall, within 12 hours after the conclusion of the Auction, file with the Bankruptcy Court a notice identifying the Successful Bidder and/or Next Highest Bidder and the Executory Contracts and Leases that such Successful Bidder and/or Next Highest Bidder will seek to take assignment from the Debtors upon the closing of the Sale.  The Debtors shall serve such notice by overnight courier or facsimile to the non-Debtor parties to such Executory Contracts and Leases.  The non-Debtor parties shall have

until **9:00 a.m. (prevailing Eastern Time) on December 20, 2017** (the "Non-Stalking Horse Assignee Objection Deadline") to object solely on the issue of whether the Successful Bidder or Next Highest Bidder (to the extent that such party is not the Stalking Horse Bidder) can provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code (an "Assignee Objection").  Any Assignee Objection shall be filed with the Court and served upon the Objection Notice Parties by electronic mail or facsimile on or prior to the Non-Stalking Horse Assignee Objection Deadline.

## AUTHORITY FOR REQUESTED RELIEF

A.    The Bidding Protections are in the Best Interests of the Debtors and their Estates, and Should be Approved

24.    The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  See In re Mushroom Transp. Co., 382 F.3d 325, 339 (3d Cir. 2004) (debtor in possession "had a fiduciary duty to protect and maximize the estate's assets"); Official Comm. of Unsecured Creditors of Cybergenics, Corp v. Chinery, 330 F.3d 548, 573 (3d Cir. 2003) (same); Four B. Corp. v. Food Barn Stores, Inc. (In re Barn Stores, Inc.), 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand").  To that end, the United States Court of Appeals for the Third Circuit recognizes that bid protections, including traditional breakup fees and expense reimbursement provisions, will be approved where they are necessary for the preservation of the debtor's estate.  See, e.g., In re Reliant Energy Channelview LP, 594 F.3d 200, 206 (3d Cir. 2010) (citing Calpine Corp. v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.), 181 F.3d 527, 537 (3d Cir. 1999); see also Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.), 147 B.R. 650, 659 (S.D.N.Y. 1992) (bidding procedures "encourage bidding and . . . maximize the value of the debtor's assets").

25.    In this case, Middleton has submitted the highest and best offer for the Assets following the Debtors' prepetition marketing offers, but on the condition that it receive the bidding protections set forth in the LOI and, once executed, the Stalking Horse Purchase Agreement.  The Debtors believe that it is in the best interests of their respective estates and creditors to enter into the LOI and Stalking Horse Purchase Agreement, and thus hereby seek approval of the bidding protections set forth therein.

26.    In O'Brien, the Third Circuit held that even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions of section 503(b) of the Bankruptcy Code govern in the bankruptcy context. Accordingly, to be approved, bidding incentives must benefit a debtor's estate.  Id. at 533.

27.    The Third Circuit identified at least two instances in which bidding incentives may benefit the estate.  First, benefit may be found if "assurance of break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited."  Id. at 537.  Second, where the availability of bidding incentives induce a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth."  Id.

28.    In O'Brien, the Third Circuit referred to nine factors that the bankruptcy court viewed as relevant in deciding whether to award a breakup fee or expense reimbursement:  (1) the presence of self-dealing or manipulation in negotiating the breakup fee; (2) whether the fee harms, rather than encourages, bidding; (3) the reasonableness of the breakup fee relative to the purchase price; (4) whether the "unsuccessful bidder place[d] the estate property in a sales configuration

01:22542735.4

mode to attract other bidders to the auction"; (5) the ability of the request for a breakup fee "to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders"; (6) the correlation of the fee to a maximization of value of the debtor's estate; (7) the support of the principal secured creditors and creditors' committees of breakup fee; (8) the benefits of the safeguards to the debtor's estate; and (9) the "substantial adverse impact [of the breakup fee] on unsecured creditors, where such creditors are in opposition to the breakup fee." Id. at 536.

29.     Under the standards adopted by the Third Circuit in Reliant and O'Brien, the Breakup Fee and Minimum Overbid should be approved.  Paying a Breakup Fee of as little as 1.3% of the potential Purchase Price in the event the Debtors sell the Assets to a bidder other than Middleton is reasonable in this type of transaction.  See, e.g., In re Filene's Basement, LLC, Case No. 11-13511 (KJC) (Bankr. D. Del. Apr. 9, 2012) (Court approved breakup fee of 3%); In re Magic Brands, LLC, Case No. 10-11310 (BLS) (Bankr. D. Del. Apr. 22, 2010) (Court approved breakup fee and reimbursement expense equal to 3.5% of cash portion of purchase price); In re Chi-Chi's, Inc., Case No. 03-13063 (Bankr. D. Del. Nov. 4, 2003) (fee of 5.1% permitted). Additionally, payment of the Breakup Fee will not diminish the Debtors' estates.  The Debtors will not incur the obligation to pay the Breakup Fee unless a higher and better bid is accepted and such transaction closes.

30.     Perhaps most importantly, absent authorization of the Breakup Fee, and Minimum Overbid, the Debtors will lose Middleton's bid and thus may lose the opportunity to obtain the highest and best offer for the Assets, thereby making the bid protections necessary to preserve the value of the Debtors' estates.  Providing Middleton payment of the Breakup Fee and the setting of the Minimum Overbid have promoted and will promote more competitive bidding by inducing

Middleton's bid that otherwise would not be made, and without which bidding would have been

and would continue to be limited.  Furthermore, the Breakup Fee and Minimum Overbid induced

Middleton to submit a bid that will serve as a minimum or floor bid on which other bidders and the

Debtors can rely.  If the bidding protections are not approved, Middleton will not go forward with

the Stalking Horse Purchase Agreement.  Because, among other things, approval of the bidding

protections is a prerequisite for going forward with the Stalking Horse Purchase Agreement, the

bidding protections are in the best interests of the Debtors' estates and necessary to preserve the

value of the Debtors' estates.

31.      Finally, the bidding protections were negotiated in good faith and were the product

of arm's-length negotiations.

32.      Accordingly, the Debtors request that the Court authorize payment of the Breakup

Fee and approve the Minimum Overbid as set forth in the Sale Procedures.

B.      The Sale is Within the Sound Business
        Judgment of the Debtors and Should be Approved

33.      Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor in

possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of

business, property of the estate."  11 U.S.C. § 363(b)(1).  Section 363 of the Bankruptcy Code does

not set forth a standard for determining when it is appropriate for a court to authorize the sale or

disposition of a debtor's assets prior to confirmation of a plan.  However, courts in this Circuit and

others have required that the decision to sell assets outside the ordinary course of business be based

upon the sound business judgment of the debtors.  See In re Abbotts Dairies of Pennsylvania, Inc.,

788 F.2d 143 (3d Cir. 1986); see also Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir.

1996); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071

(2d Cir. 1983); Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp.,

(In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999); In re Delaware &

Hudson Ry. Co., 124 B.R. 169, 176 (D.D.C. 1991).

34.     The "sound business judgment" test requires a debtor to establish four elements in

order to justify the sale or lease of property outside the ordinary course of business, namely, (a)

that a "sound business purpose" justifies the sale of assets outside the ordinary course of business,

(b) that adequate and reasonable notice has been provided to interested persons, (c) that the debtors

have obtained a fair and reasonable price, and (d) good faith.  Abbotts Dairies, 788 F.2d 143;

Titusville Country Club v. Pennbank (In re Titusville Country Club), 128 B.R. 396, 399 (Bankr.

W.D. Pa. 1991); In re Sovereign Estates, Ltd., 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989).  In this

case, the Debtors submit that the decision to proceed with the Sale of the Assets and the Sale

Procedures related thereto is based upon their sound business judgment and should be approved.  A

debtor's showing of a sound business purpose need not be unduly exhaustive but, rather, a debtor is

"simply required to justify the proposed disposition with sound business reasons."  In re Baldwin

United Corp., 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984).  Whether or not there are sufficient

business reasons to justify a transaction depends upon the facts and circumstances of each case.

Lionel, 722 F.2d at 1071; Montgomery Ward, 242 B.R. at 155 (approving funding of employee

incentive and severance program; business purpose requirement fulfilled because stabilizing

turnover rate and increasing morale were necessary to successful reorganization).

35.     Additionally, section 105(a) of the Bankruptcy Code provides a bankruptcy court

with broad powers in the administration of a case under the Bankruptcy Code.  Section 105(a)

provides that "[t]he court may issue any order, process, or judgment that is necessary or

appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).  Provided

that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated

by the Bankruptcy Code, the exercise of its section 105(a) power is proper.  In re Fesco Plastics

Corp., 996 F.2d 152, 154 (7th Cir. 1993); Pincus v. Graduate Loan Ctr. (In re Pincus), 280 B.R.

303, 312 (Bankr. S.D.N.Y. 2002).  Pursuant to section 105(a), a court may fashion an order or

decree that helps preserve or protect the value of a debtor's assets.  See, e.g., Chinichian v.

Campolongo (In re Chinichian), 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the

power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the

Bankruptcy Code."); In re Cooper Props. Liquidating Trust, Inc., 61 B.R. 531, 537 (Bankr. W.D.

Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect

whatever equities a debtor may have in property for the benefit of its creditors as long as that

protection is implemented in a manner consistent with the bankruptcy laws.").

36.    More than ample business justification exists to sell the Assets to Middleton, the

Successful Bidder (or Next Highest Bidder) pursuant to the Sale Procedures and on substantially

the terms set forth in the LOI and Stalking Horse Purchase Agreement.  The Debtors, in

consultation with their advisors, have engaged in good faith and extensive negotiations with

Middleton that have resulted in what the Debtors consider a fair price for the Assets.  Moreover, it

is essential to sell the Assets promptly to preserve their value given the circumstances facing the

Debtors' businesses as a result of their liquidity position.  Additionally, the Debtors' post-petition

financing and use of cash collateral is conditioned on approval of a Sale Procedures Order, in form

and substance satisfactory to the Lenders, by no later than December 5, 2017.  See Interim DIP

Order, ¶ 21.  The Sale Procedures and the Auction will generate maximum interest and bidding

under the circumstances, and that the bidding process will yield the highest and best bids for the

Assets.  Accordingly, the relief sought by this Motion is not only reasonable, but necessary, to

preserve and maximize the value of the Debtors' estates for the benefit of their stakeholders.

01:22542735.4

37.    The notice described herein and the Sale Procedures are designed to provide adequate notice to all potentially interested parties, including those who have previously expressed a potential interest in purchasing the Assets.  Accordingly, the proposed Sale satisfies the second prong of the Abbotts Dairies standard.

38.    Moreover, the Sale Procedures are designed to maximize the value received for the Assets.  The process proposed by the Debtors allows for a timely auction process, particularly given the current liquidity of the Debtors, while providing bidders with sufficient time and information to submit a timely bid.  The Sale Procedures are designed to ensure that the Assets will be sold for the highest or otherwise best possible purchase price under the circumstances.  The Debtors are subjecting the value of the Assets to market testing and permitting prospective purchasers to bid on the Assets.  The proposed Sale will be subjected to a market check through the solicitation of competing bids in a court-supervised Auction process as set forth in the Sale Procedures.  Accordingly, the Debtors and all parties in interest can be assured that the consideration received for the Assets will be fair and reasonable, and the third prong of the Abbotts Dairies standard is satisfied.  As discussed below, the "good faith" prong of the Abbotts Dairies standard is also satisfied here.

C.    The Sale is Proposed in "Good Faith"
Under Section 363(m) of the Bankruptcy Code

39.    The Debtors request that the Court find that the Successful Bidder (or Next Highest Bidder) is entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the Sale.

40.    Section 363(m) of the Bankruptcy Code provides, in pertinent part:

The reversal or modification on appeal of an authorization under subsection (b) . . . of this section of a sale . . . of property does not affect the validity of a sale . . . under such authorization to an entity that purchased . . . such property in good faith, whether or not such

> entity knew of the pendency of the appeal, unless such authorization
> and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

41.     Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold

pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the

purchased assets if the order allowing the sale is reversed on appeal.  Additionally, the United

States Court of Appeals for the Third Circuit (the "Third Circuit") has indicated that section

363(m) of the Bankruptcy Code also protects the assignee of a debtor's interest in executory

contracts under section 365 of the Bankruptcy Code.  Krebs Chrysler-Plymouth, Inc. v. Valley

Motors, Inc., 141 F.3d 490, 497-98 (3d. Cir. 1998).  In Krebs, the Third Circuit considered

"whether assignments of [certain automobile dealership] franchises under section 365 are also sales

of estate property subject to section 363(m)."  Id. at 497.  Despite the absence of an explicit

reference to assignments of executory contracts under section 365 of the Bankruptcy Code, the

Third Circuit in Krebs concluded that section 363(m) of the Bankruptcy Code protected an

assignment of a debtor's interest in certain automobile franchise agreements pursuant to an auction

sale.  Like the franchise agreements protected in Krebs, the Executory Contracts and Leases may

be assumed and assigned pursuant to section 365 of the Bankruptcy Code.  In light of Krebs, the

Debtors respectfully submit that section 363(m) applies to protect the Successful Bidder (or Next

Highest Bidder) with respect to both the Executory Contracts and Leases designated for

assumption and assignment and the assets and other property comprising the Assets that are

included in such bids.

42.     As required by section 363(m) of the Bankruptcy Code, the Sale Procedures have

been proposed in good faith and provide for both the Debtors and the potential purchasers to act in

good faith in negotiating the Sale and the assignment of the designated Executory Contracts and

Leases.  Although the Bankruptcy Code does not define "good faith purchaser," the Third Circuit,

construing section 363(m) of the Bankruptcy Code, has stated that "the phrase encompasses one

who purchases in 'good faith' and for 'value'."  Abbotts Dairies, 788 F.2d at 147.  To constitute

lack of good faith, a party's conduct in connection with the sale must usually amount to "fraud,

collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair

advantage of other bidders."  Id. (citing In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th

Cir. 1978)).  See also In re Bedford Springs Hotel, Inc., 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989);

In re Perona Bros., Inc., 186 B.R. 833, 839 (D.N.J. 1995).  Due to the absence of a bright line test

for good faith, the determination is based on the facts of each case, concentrating on the "integrity

of [an actor's] conduct during the sale proceedings."  In re Pisces Leasing Corp., 66 B.R. 671, 673

(E.D.N.Y. 1986) (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1998 (7th Cir. 1978)).

43.      Here, the Sale of the Assets, and the assignment and/or transfer of those Executory

Contracts and Leases designated by the Stalking Horse Bidder or such other purchaser who may

submit a higher or better bid, is in good faith.  There is no evidence of fraud or collusion in the

Debtors' marketing process.  To the contrary, as discussed throughout this Motion, and as will be

further demonstrated at the Sale Hearing, the Stalking Horse Purchase Agreement or such other

purchase agreement that the Court is ultimately asked to approve will be the culmination of an

exhaustive solicitation and negotiation process in which all parties are expected to be represented

by counsel.  All negotiations have been and will continue to be conducted on an arms-length, good

faith basis, and the Sale Procedures are designed to ensure that no party is able to exert undue

influence over the process.  Under the circumstances, the Successful Bidder (or Next Highest

Bidder) should be afforded the protections that section 363(m) of the Bankruptcy Code provides to

a good faith purchaser.  Furthermore, the Sale Procedures are designed to prevent the Debtors or

the Successful Bidder (or Next Highest Bidder) from engaging in any conduct that would cause or

permit the Stalking Horse Purchase Agreement and any subsequent purchase agreement, or the

Sale of the Assets to the Successful Bidder (or Next Highest Bidder) pursuant thereto and hereto,

to be avoided under section 363(n) of the Bankruptcy Code.

44.     All parties in interest will receive notice of the Sale and will be provided with an

opportunity to be heard.  Additionally, all counterparties to Executory Contracts and Leases will be

provided notice of the potential assumption and assignment of their agreements and an opportunity

to be heard.  The Debtors submit that such notice is adequate for entry of the Sale Order.

D.     The Sale Satisfies the Requirements
       of Section 363(f) of the Bankruptcy Code

45.     Under section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell all or

any part of its property free and clear of any and all liens, claims or interests in such property if:  (i)

such a sale is permitted under applicable non-bankruptcy law; (ii) the party asserting such a lien,

claim or interest consents to such sale; (iii) the interest is a lien and the purchase price for the

property is greater than the aggregate amount of all liens on the property; (iv) the interest is the

subject of a *bona fide* dispute; or (v) the party asserting the lien, claim or interest could be

compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest.  11

U.S.C. § 363(f); Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D.

Pa. 1988) (noting that section 363(f) of the Bankruptcy Code is written in the disjunctive;

therefore, a court may approve a sale "free and clear" provided at least one of the subsections is

met).  Because the Debtors expect that they will satisfy the second and fifth requirements of

section 363(f) in this case, if not others as well, approving the sale of the Assets free and clear of

all adverse interests is warranted.  Furthermore, courts have held that they have the equitable

power to authorize sales free and clear of interests that are not specifically covered by section

363(f).  See, e.g., In re Trans World Airlines, Inc., 2001 WL 1820325 at *3, 6 (Bankr. D. Del.

March 27, 2001); Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor

Credit Corp.), 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987).

46.     The Debtors reserve their rights to make additional written and/or oral legal

argument concerning their request to sell the Assets free and clear of all interests after it is

determined exactly which Assets may be transferred in the Sale, and in response to any objections

thereto.

47.     For all of the foregoing reasons, the sale of the Debtors' Assets satisfies the

requirements under § 363(f).

E.     Assumption and Assignment
       of Executory Contracts and Unexpired Leases Should be Approved

48.     To facilitate and effectuate the Sale of the Assets, the Debtors seek authority to

assume, assign and/or transfer the Executory Contracts and Leases to the Successful Bidder (or the

Next Highest Bidder) to the extent required by such Successful Bidder (or Next Highest Bidder).

Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory

contracts and unexpired leases, subject to the approval of the Bankruptcy Court, provided that the

defaults under such contracts and leases are cured and adequate assurance of future performance is

provided.  A debtor's decision to assume or reject an executory contract or unexpired lease must

only satisfy the "business judgment rule" and will not be subject to review unless such decision is

clearly an unreasonable exercise of such judgment.  Group of Institutional Investors v. Chicago,

Milwaukee, St. Paul & Pacific Ry. Co., 318 U.S. 523 (1943) (applying Bankr. Act section 77

subsection (b), the predecessor to Bankruptcy Code section 365) (rejecting the test of whether the

executory contract was burdensome in favor of whether rejection is within the debtor's business

judgment); Lubrizol Enter., Inc. v. Richmond Metal Finishers, Inc., 756 F.2d 1043, 1046-47 (4th Cir. 1985).

49.      The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." See Carlisle Homes. Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1989).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  In re Bygaph, Inc., 56 B.R. 596, 605-6 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when the prospective assignee of a lease from the debtors has the financial resources and has expressed a willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding; "chief determinant of adequate assurance of future performance is whether rent will be paid").

50.      The Successful Bidder (or the Next Highest Bidder) may desire to take assignment of certain Executory Contracts and Leases related to or comprising the Assets.  To the extent Executory Contracts and Leases are identified for assumption and assignment by the Successful Bidder (or the Next Highest Bidder), the Debtors believe that they can and will demonstrate that all requirements for assumption and/or assignment of the such Executory Contracts and Leases will be satisfied at the Sale Hearing.  The Debtors, as required by the Sale Procedures, will evaluate the financial wherewithal of all potential bidders before qualifying such bidders to bid for the Assets. Further, for the reasons stated throughout this Motion, the Debtors, in exercising their sound business judgment, believe that selling the Assets and assuming and assigning to the Successful Bidder (or the Next Highest Bidder) the selected Executory Contracts and Leases would be in the best interests of their estates.

51.     As set forth above, the Debtors will provide all parties to the Executory Contracts

and Leases an opportunity to be heard.  Parties will be given an opportunity to assert objections to

assumption and assignment, including as to the Cure Amounts and whether the Stalking Horse

Bidder is able to demonstrate adequate assurance of future performance.  If a party other than the

Stalking Horse Bidder is determined to be the Successful Bidder and/or the Next Highest Bidder

for the Assets, than the applicable parties to the Executory Contracts and Leases included in those

bids will have a further opportunity to raise objections to the ability of such party to provide

adequate assurance of future performance.

52.     Thus, the Debtors request that assumption and assignment of the Executory

Contracts and Leases which are designated for assumption and assignment by the Successful

Bidder (or Next Highest Bidder) should be approved.

F.     <u>Relief from the Provisions of Rule 6003 is Necessary to Avoid Immediate and Irreparable
Harm</u>

53.     Bankruptcy Rule 6003 provides:

> Except to the extent that relief is necessary to avoid immediate and
> irreparable harm, the court shall not, within 21 days after the filing of the
> petition, issue an order granting the following: . . . (b) a motion to use, sell,
> lease, or otherwise incur an obligation regarding property of the estate,
> including a motion to pay all or part of a claim that arose before the filing of
> the petition, but not a motion under Rule 4001.

Fed. R. Bankr. P. 6003.

54.     To the extent that the requirements of Bankruptcy Rule 6003 are applicable to the

relief requested herein by the granting of stalking horse bid protections or otherwise, the Debtors

submit that relief from the provisions of Rule 6003 is necessary to avoid immediate and irreparable

harm.  By the terms of the proposed Interim DIP Order, the Lenders have conditioned their

provision of post-petition financing and the use of their cash collateral on, among other things,

approval of a Sale Procedures Order, in form and substance satisfactory to the Lenders, by no later

than December 5, 2017.  See Interim DIP Order, ¶ 21.  Furthermore, absent entry of the Sale

Procedures Order and approval of the stalking horse bid protections on or before December 5,

2017, Middleton has the right to terminate the LOI and, to the extent executed, the Stalking Horse

Purchase Agreement.  See LOI ¶ 5 & 8 (as modified on the record at the "first day" hearing).  As

detailed above, such a result would have the deleterious effects of both losing the current highest

and best bid for the Assets and losing the "floor" bid that higher and better offers for the Assets

would have to exceed, jeopardizing the ability of the Debtors to preserve and maximize the value

of the Assets.

        55.     Accordingly, the Debtors hereby request that the Court waive the prohibitions of

Rule 6003, to the extent required to grant the relief sought herein.

G.      Relief from the Fourteen-Day Waiting Periods
        Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate

        56.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease

of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court

orders otherwise."  Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the

trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14

days after the entry of the order, unless the court orders otherwise."  The Debtors request that the

Sale Procedures Order and Sale Order be effective immediately by providing that the fourteen (14)

day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

        57.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time

for an objecting party to appeal before an order can be implemented.  See Advisory Committee

Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).  Although Bankruptcy Rules 6004(h) and 6006(d)

and the Advisory Committee Notes are silent as to when a court should "order otherwise" and

eliminate or reduce the fourteen (14) day stay period, Collier on Bankruptcy suggests that the

fourteen (14) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 Collier on Bankruptcy, ¶6004.11 (L. King, 16th rev. ed. 2011). Furthermore, Collier's provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. Id.

58. Accordingly, the Debtors hereby request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

## NOTICE

59. Notice of this Motion has been provided to: (i) the Office of the United States Trustee for the District of Delaware; (ii) the Office of the United States Attorney for the District of Delaware; (iii) the Internal Revenue Service; (iv) the Debtors' thirty (30) largest unsecured creditors; (v) counsel to the Debtors' prepetition and postpetition lenders; (vi) all entities known to have expressed a bona fide interest in acquiring the Assets to the Debtors' prepetition investment banker; (vii) all entities known to have asserted any lien, claim or encumbrance in or upon any of the Assets; (viii) all federal, state and local taxing authorities which have a reasonably known interest in the relief requested by the Motion; (ix) counsel to the proposed Stalking Horse Bidder; and (x) all parties requesting notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

*[Remainder of page intentionally left blank]*

## CONCLUSION

WHEREFORE, the Debtors respectfully request (a) entry of the Sale Procedures Order, substantially in the form attached hereto as Exhibit I, (b) entry of Sale Order substantially in the form attached hereto as Exhibit II, and (c) such other and further relief as the Court deems just and proper.

Dated: November 21, 2017          YOUNG CONAWAY STARGATT & TAYLOR, LLP
       Wilmington, Delaware

                              */s/ Justin H. Rucki*
                              Robert S. Brady (No. 2847)
                              Michael R. Nestor (No. 3526)
                              Justin H. Rucki (No. 5304)
                              Ashley E. Jacobs (No. 5635)
                              Tara C. Pakrouh (No. 6192)
                              Rodney Square
                              1000 North King Street
                              Wilmington, Delaware 19801
                              Telephone: (302) 571-6600
                              Facsimile: (302) 571-1253

                              *Proposed Counsel to the Debtors and Debtors in Possession*